## HART ENGINEERING COMPANY, Plaintiff,

v.

## FMC CORPORATION, Defendant.

### Civ. A. No. 83–0219 S.

United States District Court,
D. Rhode Island.

Sept. 12, 1984.

Edwards & Angell, Jeffrey C. Schreck, Providence, R.I., for plaintiff.

Hinckley & Allen, Robert Lovegreen, Michael G. Sarli, Providence, R.I., for defendant.

## OPINION and ORDER

SELYA, District Judge.

In this diversity action, 28 U.S.C. § 1332, plaintiff Hart Engineering Company (Hart) seeks to recover damages for costs incurred in the removal, shipment and reinstallation of six drive bases taken from clarifiers supplied by the defendant FMC Corporation (FMC) for use at the municipal waste water treatment facility in Holyoke, Massachusetts. Count one of plaintiff's complaint alleges a breach of express and implied warranties made in connection with the sale of the clarifiers. Count two alleges that FMC ignored its contractual obligations to Hart in the premises. The remaining two statements of claim seek damages under principles of tort law, count three being grounded in negligence and count four in strict product liability.[1]

---

1. The damages claimed by Hart are purely of an economic nature. *See* text *post* at Part III. Since the time that the action was commenced, the plaintiff has expressly conceded that count four of the complaint does not, in that circumstance, state a valid independent cause of action. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judg-

The case was docketed in this court on March 25, 1983. In January of 1984, the parties crossmoved for summary judgment. Those motions were each denied without prejudice on April 20, 1984. The plaintiff and defendant then agreed to submit the case to the court for decision on the merits essentially on their respective summary judgment initiatives, as fleshed out by an agreed statement of facts and certain other supplemental materials. Pursuant to the court's order of May 24, 1984, the parties submitted a joint bench book containing and/or referencing the desiderata to be considered by the court.[2] In addition, the matter has been amplificatively briefed. Oral argument has been waived. This opinion, therefore, constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### I.

Hart is a Rhode Island corporation with its principal place of business in East Providence, Rhode Island. FMC is incorporated under the laws of the Commonwealth of Pennsylvania and has its principal place of business in that state. Jurisdiction is premised on diversity of citizenship and the existence of a controversy in an appropriate amount. 28 U.S.C. § 1332.

The present dispute arose out of a purchase agreement entered into by Hart and FMC in early February of 1979. At that time, FMC agreed to supply a half dozen clarifiers and various other kinds of machinery for Hart's use at the municipal sewage treatment plant then under construction in Holyoke, Massachusetts (Hart having theretofore been awarded the general contract by the city). The agreement as finally executed by the parties was the product of a hard-driven (albeit not impolitic) battle of proposals and counterproposals between individuals savvy in the trade. Under the terms of that agreement, the plaintiff committed to purchase two main clarifiers, four secondary clarifiers, two gravity thickeners, and additional overload devices to be used in conjunction with already existing clarifiers. The total cost of the items to be bought aggregated $320,000.

The contract contained some twelve general terms and conditions governing the relationship between the buyer and the seller. One of those conditions provided in material part:

> 4. WARRANTY. New equipment manufactured by Seller is warranted to be free from defects in material and workmanship under normal use and service for a period of one year from date of shipment; Seller's obligation under this warranty being limited to repairing or replacing at its option any part found to its satisfaction to be so defective provided that such part is, upon request, returned to Seller's factory from which it was shipped, transportation prepaid.... THIS WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED AND SELLER SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

The last of those conditions provided:

> 12. DISCLAIMER OF CONSEQUENTIAL DAMAGES, LIQUIDATED DAMAGES OR PENALTIES. SELLER SHALL NOT BE LIABLE FOR CONSEQUENTIAL DAMAGES. CONSEQUENTIAL DAMAGES FOR THE PURPOSES OF THIS AGREEMENT SHALL INCLUDE BUT NOT BE LIMITED TO LOSS OF USE, INCOME, OR PROFIT,

---

ment and in Support of Plaintiff's Cross-Motion for Summary Judgment at 7. ("Plaintiff concedes that strict liability, to the extent it is not legally cognizable under plaintiff's warranty claims, cannot be the basis for plaintiff's recovery of economic losses alone.")

**2.** Amongst the materials proffered by the defendant was a so-called "Supplemental Affida-

vit" of one D.A. Gotwols, FMC's manager of contractual affairs. Plaintiff has moved to strike paragraphs 4, 5, and 6 of that affidavit. To the extent that plaintiff's objections are valid, however, they go to the weight and not to the admissibility of Gotwols' statements. Hart's motion is, therefore, denied.

OR LOSS OF OR DAMAGE TO PROPERTY INCLUDING, BUT WITHOUT LIMITATION, PRODUCTS MANUFACTURED, PROCESSED OR TRANSPORTED BY THE USE OF THE EQUIPMENT, OCCASIONED BY OR ARISING OUT OF THE OPERATION, USE, INSTALLATION, REPAIR OR REPLACEMENT OF THE EQUIPMENT OR OTHERWISE. . . .

In accordance with its obligations under the contract, the defendant manufactured the six clarifiers and shipped them to Holyoke in May of 1980. They were subsequently installed. For nearly two years after the goods were forwarded, there was no communication of any significance between Hart and FMC. That state of equipoise began to dissolve, however, in February of 1982. The wellspring of the instant dispute was unearthed at that time, when Tighe & Bond (T & B), the consulting engineers who had supervised erection of the plant for the city of Holyoke, discovered a malfunction in one of the new clarifiers supplied by FMC. This trickle of dissatisfaction dampened few spirits. Hart routinely notified the defendant of the problem, and at least one FMC employee sojourned to Holyoke to investigate the matter. With representatives of FMC and Hart in attendance, T & B thereafter diagnosed the malady to be the absence of major portions of weld from the clarifier's drive base. That discovery, however, revealed only the tip of what was soon found to be a ubiquitous iceberg; subsequent perscrutation by the consulting engineers dredged up the unhappy finding that substantial segments of weld were missing from the drive base components of all six of the clarifiers manufactured by the defendant.

The effluent stream of contentiousness thereafter began to run downhill. A flurry of communications between the plaintiff, the defendant, and T & B ensued. In an apparent effort to ameliorate an increasingly tense situation, the defendant offered to perform field repairs on the defective drive base components. In a letter to the plaintiff dated March 24, 1982, T & B, with obvious reluctance, agreed to allow the field repairs to go forward on a "trial basis." This acquiescence was to be conditioned, however, on FMC's and/or Hart's acceptance of financial responsibility (i) for costs to be expended in cleaning out each tank as the work progressed, and (ii) for expenses to be incurred in monitoring and evaluating the "failure and repair" of the units. As a further stipulation, T & B also insisted that the defendant furnish "an extended five year warranty from date of acceptance of the equipment repairs." A copy of that letter was sent to FMC by Hart. Not surprisingly, the proposition failed to evoke a chorus of assents.

In a letter from the defendant to the plaintiff dated March 26, 1982, A. Joseph Antunes, FMC's manager of water treatment, stated in pertinent part,

> We have been surprised at the entire reaction to the situation since we consider the problem to be a warranty problem. Our company warrantees all material to be free from defects in material and workmanship and this problem falls into the category of defective workmanship.
>
> In keeping with our policy of furnishing fully functional and reliable equipment, we plan to start work on Monday, April 5, 1982 to correct the defective workmanship. . . .
>
> We will extend the warranty on each machine for one year from the date it is restored to operating condition and put back into service.
>
> We thank you for bringing this problem to our attention so that we can bring these machines up to the quality standards that FMC wants on all of its products.

As opposed to calming troubled waters, Antunes' message served only further to roil them. In its wake, T & B shot off a rather heated letter to the defendant on April 1, 1982. That billet-doux made it plain that T & B had no intention of accepting the counterproposal; that it wished to revoke acceptance of the defective clarifi-

ers; and that it would not allow FMC to make on-site repairs.

The next entry in this turbulent sweepstakes was a cryptic communication from R.B. Parry, a Hart official, to Antunes under date of April 2, 1982. Parry purported therein to confirm a conversation with Antunes anent T & B's April 1 missive, and expressed the view that FMC should be held responsible for certain kinds of damages flowing from the clarifier problem.

Gotwols, rather than Antunes, responded to Parry on April 16, 1982. His reply was lengthy and in writing. In that dissertation, Gotwols stated in relevant part,

We were most dissappointed to receive your letter of April 2, 1982 and a copy of Tighe & Bond's letter dated April 1, 1982. We frankly feel that FMC has been dealing fairly and openly with both Hart Engineering and Tighe & Bond on the issue of repairs ... We have readily acknowledged that the missing welds constitute a defect in workmanship, which was covered by the FMC warranty and we have offered to make what we feel as the designers and manufacturers of the equipment are appropriate repairs ...

We made this offer even though our warranty expired one (1) year after shipment and under the terms of our warranty we could have requested that the equipment be returned to our factory, freight prepaid, so that the repairs could be accomplished in our own shop.

We have been prevented from making the necessary corrections and have no legal or moral obligation to pay interest on any monies [owed to Hart by Tighe & Bond] currently being retained. In addition to this, Hart Engineering has been retaining over $12,000.00 of FMC's money even though the equipment was put into operation four (4) months ago. It would certainly appear that interest at this prime rate would be applicable to these funds; however, again FMC did not make any such claim in the interest of cooperation with all concerned.

The offer as made in Mr. Antune's [sic] letter of March 26 still stands with one (1) clarification. After the first machine is repaired and it appears satisfactory to all concerned, FMC will be paid the currently retained funds of approximately $12,000.00 at which point the remaining clarifiers will be repaired in the same fashion ...

Within two weeks after the Gotwols' communique, a meeting was held in Holyoke on April 26 among representatives of FMC, Hart, T & B and the city. According to the undisputed testimony of Antunes, he reiterated during this session FMC's position that the one year express warranty had previously expired, and that the drive base defects were, therefore, not within its reach.

The record is sketchy with respect to exactly what transpired next. Yet, it is clear that, at some time before the end of May, T & B watered down its position and agreed to allow the defendant to essay on-site repairs. Work was performed on one of the clarifiers between May 26, 1982 and June 2, 1982, but the results of those efforts were unsatisfactory (at least to the keen eye of T & B). The parties continued to haggle over what corrective measures should be taken, FMC all the while maintaining that it had gone the extra mile and had already exceeded the imperatives of its contractual obligations. In mid-July, however, FMC changed course and notified Hart that it would manufacture new drive base mechanisms for each of the six clarifiers, provided that Hart returned the defective machinery to FMC's Pennsylvania plant. The defendant agreed, moreover, to warrant the replacement components for one year from the date the drive bases were transshipped back to Holyoke.

This offer was accepted. The plaintiff engaged Encon, Inc. (Encon) to disassemble the faulty components and to prepare them for shipment to FMC. Hart paid Encon $12,888 for these efforts. Thereafter, the clarifiers were sent to FMC at an additional cost of $2,013 to Hart. FMC then manufactured six new drive bases, equipped

them with machinery cannibalized from the returned goods, and remanded them to Holyoke at its own expense. Beginning in August of 1982, Encon reinstalled the drive bases (for which it received $25,019 from the plaintiff). After adjustments were performed, the clarifiers were ultimately accepted by the municipality. And, when FMC refused to absorb the plaintiff's expenses, the stream of controversy became a raging torrent. The instant litigation ensued.

## II.

▉ The court first addresses the plaintiff's contention that the defendant breached its express warranty [3] to supply equipment "free from defects in material and workmanship." [4] This court, sitting pursuant to its diversity jurisdiction, must look to the applicable state law in deciding the merits of plaintiff's claim. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In the instant case, Hart's warranty claim is governed by Article 2 of the Uniform Commercial Code.[5] Both parties have extravagantly briefed the legal issues arising under the relevant portions of that statute. Boiled down to their essentials, those arguments implicate two questions, viz., (i) whether an express warranty was in effect upon which the defendant's liability can be predicated, and if so, (ii) whether the plaintiff's claim is nevertheless barred because the defendant

fully complied with any obligations it purported to undertake. And, as a substrate of these issues, the court must deal with FMC's limitation of liability contention, stemming from a clause in the purchase agreement which is set forth in the margin.[6] To the extent necessary, the court will examine each of those questions in turn.

Section 2–313(1)(a) of the Code provides that an express warranty may be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain..." The express warranty contained in the purchase agreement between Hart and FMC, and upon which counts one and two of its complaint hinge, is, on its face, of restricted scope and duration. As noted previously, the warranty provides that "new equipment ... is warranted to be free from defects in material and workmanship under normal use ... for a period of one year from date of shipment ..."

The defendant asseverates, and the plaintiff does not dispute, that the express warranty had, according to its terms, expired well in advance of the time that the difficulty with the clarifiers surfaced. Notwithstanding the plain language contained in paragraph four, however, Hart urges that the warranty should be deemed to have been in effect in February of 1982. The plaintiff proffers two arguments in

**3.** The plaintiff has apparently abandoned its claim for breach of implied warranties as originally alleged in count one. To the extent that it has not, however, the court finds that such warranties were disclaimed in full in accordance with the applicable provisions of § 2–316 of the Uniform Commercial Code. *See* text *post.* Specifically, the court finds that the defendant's disclaimer of any implied warranty of merchantability was both particular and was conspicuous, U.C.C. § 2–316(2); and further, that its written disclaimer of any implied warranty of fitness was likewise clear. *Id.*

**4.** The contract claim contained in count two of Hart's complaint is subsumed by its claim for breach of warranty. The court's discussion and ruling with regard to count one is, therefore, also dispositive of count two.

**5.** There are, of course, three states whose law could be applied here: Rhode Island (which is

both Hart's home base and the forum state), Pennsylvania (the principal place where FMC, which does business nationally—indeed, internationally—hangs its corporate hat), and Massachusetts (the place of performance). But, since each of these have adopted substantially similar versions of Article 2 of the U.C.C., *see, e.g.,* R.I.Gen.Laws §§ 6A–2–101 *et seq.;* Mass.Ann. Laws ch. 106 §§ 2–101 *et seq.,* 12A Pa.Cons.Stat. Ann. §§ 2–101 *et seq.,* (Purdon), the court need not formally make a choice of law on this issue.

**6.** The purchase agreement reads in part:

... Seller's obligation under this warranty being limited to repairing or replacing at its option any part found to its satisfaction to be so defective provided that such part is, upon request, returned to Seller's factory from which it was shipped, transportation prepaid ...

support of that position: first, that various actions taken by representatives of FMC in the late spring and early summer of 1982 either separately or together amounted to an implicit waiver of the limited period of the warranty and/or a reaffirmation of the terms of the original warranty; and second, that even if the defendant's conduct did not evidence an intent to resuscitate its original obligations, the one year limitation cannot be enforced under Section 2–719(2) of the U.C.C.

■ Taking first things first, there is admittedly some evidence which favors what the plaintiff chooses to characterize as a "waiver" argument. Yet, the record as a whole does not support a finding that the defendant, by word or by deed, ever agreed to relax the encincture of its then expired warranty during mid–1982. Indeed, Hart's attempt to classify FMC's behavior as some sort of a waiver is akin to trying to force a square peg into a round hole. A waiver in its classic sense is a "voluntary and intentional relinquishment of a known right, benefit, claim or privilege which, except for such waiver, the party would have enjoyed." *Richland County v. State*, 180 N.W.2d 649, 657 (N.D.1970). *See also Kelly v. Lovejoy*, 172 Mont. 516, 520, 565 P.2d 321, 324 (1977); *cf. Duffy v. Quattrocchi*, 576 F.Supp. 336, 341–42 (D.R. I.1983). To view the warranty, or even the delimited term which is part and parcel thereof, as a privilege or benefit enjoyed by the defendant is to turn the actual relationship of rights and obligations established by the purchase agreement on its head. Thus, it would seem that the defendant's conduct in the spring and summer of 1982 could not have amounted to a waiver. If there is anything to be said for Hart's

point, its thesis must be that a novation or affirmative revivification of the terms of the original agreement occurred.

■ Be that as it may, the law of contracts is not intended as a snare for the unwary. It is, therefore, a cornerstone of contract law that a meeting of the minds is an essential prerequisite to the formation of an enforceable agreement. *E.g., Turcotte v. Griffin*, 120 N.H. 292, 294, 415 A.2d 668, 669 (1980); *J. Koury Steel Erectors, Inc. v. San-Vel Concrete Corp.*, 120 R.I. 360, 365, 387 A.2d 694, 697 (1978). FMC does not dispute that, in its letters of March 26, 1982 and April 16, 1982, it offered to reinstate its original warranty with respect to any future drive base problems which might develop. Contrary to Hart's assertions, however, neither that unrequited proposal, nor indeed the defendant's professed willingness to perform field repairs (and subsequently, to remanufacture the defective components), necessarily evidences an assent to the reinstitution of the warranty for purposes of the repairs at issue.

That FMC never agreed to readopt its former obligations is made manifest when one places the offers which the defendant actually tendered in their proper perspective. An examination of the record reveals that, with the possible exception of some isolated language contained in Antunes' letter of March 26,[7] there was absolutely nothing said or done by FMC which could possibly be construed as evidencing an intent to be bound by the terms of its original warranty. To the contrary, the record is replete with evidence which demonstrates that FMC made it perfectly clear at the time that the original warranty had long since expired and that any action it

---

**7.** While arguably subject to a contrary interpretation, Antunes' statements that "we consider the problem to be a warranty problem ..." and that "in keeping with our policy of furnishing fully functional ... equipment, we plan to start work ... to correct the defective workmanship" do not, in the context in which they arose, smack of the words of an individual knowingly agreeing to undertake contractual obligations on behalf of his corporate employer. Rather, they appear to be the statements of an employee

less than well-versed in the specifics of the original warranty, one who likely was not even aware that FMC's express warranty had ceased to be in effect. Even more telling on this point, there is nothing which indicates that either Hart or T & B contemporaneously understood these statements to be a binding reaffirmation of FMC's then defunct warranty. Finally, if any confusion existed with respect to the meaning of Antunes' comments, it was surely put to rest by Gotwols' straightforward letter of April 16, 1982.

chose to take with respect to the ramshackle drive bases would be gratuitous. Nor has the plaintiff proffered probative evidence that it accepted any of the defendant's proposals. Hart's suggestion that a meeting of the minds occurred anent resurrection of the long-dead warranty is, accordingly, the merest of velleities. No novation was effected; no extension of the warranty period took place; and no revival of the defendant's once and former commitments transpired.

Having concluded that FMC did not explicitly or implicitly agree to pump new life into a warranty which had, by its terms, expired, the court proceeds to consider whether or not recourse to the warranty should nonetheless be deemed available to the plaintiff because the one year limiting period built into the warranty is unenforceable as a matter of law.

The plaintiff's thesis in this respect is bottomed on Section 2–719(2) of the Code. The statute provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." Citing, inter alia, *Koehring Co. v. A.P.I., Inc.*, 369 F.Supp. 882 (E.D.Mich.1974) *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3rd Cir.1970), and *Wilson Trading Corp. v. Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968), and contending that the flaws in the drive bases were not discoverable within the period provided in the warranty, Hart seeks shelter in the argument that the warranty fell short of its fundamental purpose. It is out of these flimsy materials that the plaintiff constructs its theorem that the temporal limitation should be disregarded. It takes very little huffing and puffing,

however, to blow down this particular edifice. *Cf. The Three Little Pigs In Verse* 7–13 (1st ed. 1962) (author unknown) (houses one and two).

█ First, as the defendant has correctly noted, Section 2–719 is concerned with the circumscription or modification of *remedies*, not with language purporting to define the scope of a seller's *liability*. It is, therefore, plainly inapposite to the one year time warranty contained in the purchase agreement. Indeed, in contrast to the carefully crafted standards against which both remedy limitations and warranty disclaimers [8] must be measured, there is no explicit authorization anywhere in the Code for invalidating the kind of durational warranty here at issue. In fact, such an approach would appear to run at cross purposes with the spirit, if not with any specific provision, of the Code. As postulated in the joint work of two eminent commentators,

> [I]f we were on the bench, we would not be receptive to claims that time warranties are unreasonable or unconscionable. Since the Code does not oblige the seller to make any express warranties, limitations on such warranties should stand in the absence of inconsistency under 2–316(1).

White, J. and Summers, R., *Uniform Commercial Code* 431 n. 19. (2nd Ed.1982) (citing, inter alia, *Sterner Aero AB v. Page Airmotive*, 499 F.2d 709 (10th Cir.1974) (rebuilt aircraft warranted for six months or 100 hours of operation); *Alfred N. Koplin & Co. v. Chrysler Corp.*, 49 Ill.App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100 (1977) (air conditioning unit warranted for eighteen months).[9]

---

**8.** *See, e.g.,* U.C.C. § 2–316 (discussed *supra,* note 3).

**9.** The portion of § 2–316(1) alluded to by White and Summers in the quoted comment states:
[W]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence

(Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.
That section "seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty ..." Uniform Commercial Code, § 2–316, Official Comment 1. It has no conceivable application in Hart's case.

And, assuming arguendo that the interdiction of a time warranty might be appropriate in an exceptional case, no such departure is merited here. In stark contradistinction to the facts of cases like *Neville Chemical Co. v. Union Carbide Corp.* and *Wilson Trading Corp. v. David Ferguson, Ltd.*, both *supra*, the durational restriction that Hart challenges does not span a mere matter of days.[10] Nor is this a case reminiscent of *Koehring Co. v. A.P.I., Inc.*, *supra*, which, because of the seller's willful and dilatory disregard of its contractual obligations, fairly cried out for judicial intervention. The case at bar is vastly different. It would be rank understatement to remark that FMC was not derelict in its duties; its attempts to repair the imperfect drive base components went far above and beyond the call of duty.

Finally (but not unimportantly), there is no evidence whatsoever that unfairness polluted the process by which the contract was negotiated, drafted, and ultimately executed. The plaintiff and the defendant are both commercially sophisticated parties. Each had the opportunity to, and did in fact, bargain over what were eventually memorialized as the terms and conditions of the purchase agreement. Under the Code, absent a showing that the terms of a warranty are so unreasonable as to be oppressive, or that there existed some impropriety during the process of contract formation which deprived one of the contracting parties of a meaningful choice, *see, e.g., Frank's Maintenance & Engineering v. C.A. Roberts Co.*, 86 Ill.App.3d 980, 989–90, 42 Ill.Dec. 25, 32, 408 N.E.2d 403, 410 (1980), the dimensions and scope of warranties are fair game for negotiation. *Benton County Public Utility District No. 1 v. General Electric Co.*, 22 U.C.C. 55, 58 (E.D.Wash.1976). In fine, within the boundaries set by oppressiveness and inequitable dealing, the parties can fashion a warranty shaped to suit their mutual desires. And, having made the warranty bed to their joint cohabitative taste, they must then and thereafter sleep in it. The Code's unconscionability provisions were, after all, not intended "to relieve an experienced merchant of the misfortunes occasioned by his own poor business practices." *Argo Welded Products, Inc. v. J.T. Ryerson Steel & Sons*, 528 F.Supp. 583, 593 (E.D. Pa.1981). If the plaintiff has any legitimate complaint, it centers around Hart's own lack of foresight. The one year time limit is, in this case, wholly enforceable.

For the foregoing reasons, the court finds that there is no predicate sufficient to posit any liability on FMC's part under either a warranty or a contract theory; and the defendant is, therefore, entitled to judgment on counts one and two of the complaint. And, in view of this conclusion, the court need not decide whether plaintiff's claim for damages is also barred by the repair-only language of the purchase agreement. *See* note 6, *ante*.

### III.

Such a disposition leaves open, however, the plaintiff's claim for negligent manufacture. Hart alleges in count three of its complaint that FMC had a duty to exercise reasonable care in the manufacture of the drive base components, that it breached this duty, and that such breach was the proximate cause of damages sustained by the plaintiff. FMC contends that relief under count three is precluded both as a matter of fact and a matter of law. The defendant denies negligence and further denies that its conduct was the legal cause of the alleged harm to Hart. Alternatively, FMC asserts that, irrespective of the resolution of disputed issues of fact anent due care and proximate cause, purely "economic loss" damages of the kind at issue in the instant case are not recoverable in an action for negligence. Although the existence of negligence *vel non* may present a rather simplistic question in view of the defendant's admission that the ab-

---

**10.** In *Neville Chemical*, the contested clause required that notice of claims be given within fifteen days after receipt of the purchased materials. In like manner, *Wilson Trading Corp.* involved the validity of a ten day notice requirement.

sence of portions of weld on each of the six clarifiers was attributable to faulty workmanship on its part, the court need not dwell on this issue. Assuming arguendo that negligence and proximate cause have been shown, Hart is nevertheless foreclosed from recovery.

Once again, a choice of law issue lurks at the threshold. Under the *Erie* doctrine, conflicts principles are substantive; and thus, this court must look to Rhode Island's choice of law rules. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). With respect to tort actions, Rhode Island has adopted and applied an interest-weighing approach. *Woodward v. Stewart*, 104 R.I. 290, 299–300, 243 A.2d 917, 923 (1968). Under this arrangement, a melange of factors (articulated in the Restatement (Second) of Conflicts § 142(2)), must be scrutinized in order to determine whether a state has an interest in the controversy. These include:

(1) the place where the injury occurred;

(2) the place where the conduct causing the injury occurred;

(3) the domicile, residence, nationality, place of business of the parties; and

(4) the place where the relationship, if any, between the parties is centered.

*Brown v. Church of Holy Name of Jesus*, 105 R.I. 322, 326–27, 252 A.2d 176, 179 (1969).

If several states have a legitimate stake in the elements of a particular case, the court must then determine whether the substantive law of these states regarding the relevant issue is in conflict; and if so, the selection of substantive law is determined according to the following guidelines:

(1) predictability of results;

(2) maintenance of interstate and international order;

(3) simplification of the judicial task;

(4) advancement of the forum's governmental interest; and

(5) application of the better rule of law.

*Woodward*, 104 R.I. at 300, 243 A.2d at 923.

It has already been noted in connection with the contract-oriented issues, *see* text and note 5, *ante*, that three states have a substantial nexus with the present controversy. That analysis continues to endure on the tort side: the goods were intended for use in Massachusetts, and the malfunction occurred there; FMC is a Pennsylvania corporation, and the drive base components were manufactured in Pennsylvania; and Rhode Island is both Hart's state of incorporation and the place where the contract between the parties was made. Yet, given the *Woodward* rule, it is unnecessary to split the required hairs in order to find a single center of gravity anent this action—for in the instant case, the court is persuaded that the highest courts of all three affected jurisdictions would be of a single mind in focusing upon the centrosymmetric issue.

As both parties correctly observe, whether a negligence plaintiff is entitled to recover damages for purely economic loss [11] is an issue not yet determined by the highest tribunal of Massachusetts,[12] Penn-

---

11. "Economic loss," for purposes of this discussion, encompasses the costs associated with repair and-or replacement of a defective product, or loss of profits consequent thereto, apart from any injury or damage to other property. It cannot seriously be disputed that Hart's claim here involves only economic loss. Indeed, the expenses in question (arising out of the dismantling of the product, its return to the manufacturer, and its subsequent reinstallation) are classic exemplars of the genre. While the plaintiff makes a half-hearted attempt to distinguish its costs as "incidental damages" under § 2–715 of the Code, that distinction makes no difference. Insofar as these expenses are entitled to some special treatment as "incidental damages", recovery depends upon an actionable breach of contract, *see* U.C.C. § 2–714(3); and, as noted above, *see* text *ante* at Part II, Hart's contract claims are time-barred. Thus, for tort purposes, the classification of the plaintiff's damages as "incidental" (or not) is meaningless.

12. While the Supreme Judicial Court has been silent on the precise issue, the commonwealth's intermediate appellate court has apparently hewed the line of cases precluding recovery in such circumstances. *Marcil v. John Deere Industrial Equipment Co.*, 9 Mass.App. 625, 631–32, 403 N.E.2d 430, 433–34 (1980).

sylvania,[13] or Rhode Island. Thus, it becomes

> this court's task to vaticinate what the decision of the [state court] would be were that court faced with the issue.... In undertaking this forecast, the court must look to relevant, i.e., analogous, state court decisions ... and may assay sister state adjudications of the issue.

*Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 921–22 (D.R.I.1983) (citations omitted). *See also Murphy v. Erwin-Wasey, Inc.,* 460 F.2d 661, 663 (1st Cir.1972). The court therefore turns to the formulation of such a prediction.

Where, as here, the defect in the product does not create an unreasonable risk of danger, and the only resultant harm is the failure of the item to meet commercial expectations, an overwhelming majority of courts have held that strict products liability is not an appropriate vehicle for recovery of mere economic loss. *E.g., Pennsylvania Glass Sand Corp.,* 652 F.2d at 1173–74 (Pennsylvania law); *Fredonia Broadcasting Corp. v. RCA Corp.,* 481 F.2d 781, 797 (5th Cir.1973) (Texas law); *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.,* 422 F.2d 1013, 1020–1021 (9th Cir.) (Arizona law), *cert. denied,* 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970); *Midland Forge, Inc. v. Letts Industries,* 395 F.Supp. 506, 515 (N.D.Iowa 1975) (Iowa law); *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill. Dec. 746, 750–51, 435 N.E.2d 443, 447–48 (1982); *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279, 283–86 (Alaska 1976); *Hiigel v. General Motors Corp.,* 190 Colo. 57, 64–65, 544 P.2d 983, 989 (1975). These

courts, in effect, have echoed and amplified upon the position advocated by the Supreme Court of California in the seminal case of *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) to the effect that such damages are not recoverable in tort.[14]

▪ The rationale underlying this comparatively narrow treatment of items of economic loss becomes apparent when one examines the policies which gave vitality to the rule of strict product liability. The doctrine was designed to protect individuals from those defective products which created conditions not contemplated by the ultimate consumer and which proved, therefore, to be unreasonably dangerous to him or his property. *Ritter v. Narragansett Electric Co.,* 109 R.I. 176, 188, 283 A.2d 255, 261 (1971). As the Fourth Circuit noted in assessing Restatement (Second) Torts § 402A:

> Under the formulation of the Restatement (Second), the policies of strict products liability come into play only as to products "in a defective condition unreasonably dangerous to the user or consumer or to his property." Restatement (Second) § 402A.

*Purvis v. Consolidated Energy Products Co.,* 674 F.2d 217, 222 (4th Cir.1982).

For the defect to be "unreasonably dangerous" within the meaning of § 402A, there must be a real likelihood of injury to the user or consumer. Conditioning the rule in this manner safeguards the innocent consumer who is unaware of the danger involved in handling the product in the normal manner, *Ritter,* 109 R.I. at 191, 283

---

**13.** Although the Pennsylvania Supreme Court has not spoken directly to the point, the federal Court of Appeals for the Third Circuit has analyzed Pennsylvania law, and has concluded that recovery in tort is not allowable for purely economic loss. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1173 (3d Cir.1981); *cf. Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 755 (3d Cir.1976).

**14.** In so holding, Justice Traynor rejected some now familiar dicta which had appeared several months earlier in the landmark decision of the New Jersey Supreme Court in *Santor v. A & M*

*Karagheusian, Inc.,* 44 N.J. 52, 66, 207 A.2d 305, 312 (1965). *Seely,* 63 Cal.2d at 18, 45 Cal.Rptr. at 23–24, 403 P.2d at 151–52. In *Santor,* a case in which the plaintiff sought damages solely for disappointed economic expectations, it was held that the plaintiff could recover against the defendant manufacturer for breach of warranty despite the lack of privity between them; and the court went on to indicate in dicta that the result would have been the same had the plaintiff brought his action under the doctrine of strict liability in tort notwithstanding the nature of his damages.

A.2d at 263, and in that sense strikes an equitable balance between the manufacturer's presumed expertise and control and the relatively unsophisticated and unprotected status of the prototypical end user.

There is no parallel rationale, however, for extending this special prophylaxsis to provide relief for mere disappointment in product performance. In such circumstances, the same imbalance is not present; and the need for an expansive rendering of legal rights and remedies is considerably less. As the *Purvis* court remarked:

> All products carry the risk that they will serve their intended function poorly. In this sense, the risk of "ordinary" malfunctions is well within the contemplation of the average purchaser. *See, Two Rivers Co. v. Curtiss Breeding Service,* 624 F.2d 1242, 1249 (5th Cir.1980); *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981); *Young v. Tide Craft, Inc.,* 270 S.C. 453, 242 S.E.2d 671, 679–80 (1978). This view comports with common sense as well as with the underlying purpose of strict products liability, which is to protect consumers from products which are unreasonably unsafe, not from those which are merely ineffective. *See, Two Rivers Co.,* 624 F.2d at 1248–51; *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 754–75 (3rd Cir.1976); *Texsun Feed Yards, Inc. v. Ralston Purina Co.,* 447 F.2d 660, 666–67 (5th Cir.1971); *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.,* 623 P.2d 324 (Alaska 1981); *Brown v. Western Farmers Association* 268 Or. 470, 521 P.2d 537, 542 (1974); *Nobility Homes, Inc. v. Shivers,* 557 S.W.2d 77, 79–80 (Tex.1977). When a loss results from mere product ineffectiveness, it is the law of contracts and commercial transactions rather than strict products liability which fixes responsibility for the loss. *See generally, Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17 [21–22], 403 P.2d 145, 149–50 (1965).

*Purvis,* 674 F.2d at 222–23.

In *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280, 288–89 (3d Cir.1980), the Third Circuit phrased the *ratio decidendi* for the rule as follows:

> The rationale behind strict liability in personal injury situations is not well-suited to claims alleging only economic loss. Economic loss results from the failure of the product to perform to the level expected by the buyer and the seller. Such loss is most frequently measured by the cost of repairing the infirmity or by the difference in the value of the product as it exists and the value it would have had if it performed as expected. Thus, economic loss is almost always incurred by the owner of the product, not by persons who merely use it or come into contact with it. The original purchaser, particularly a large company such as Jones & Laughlin, can protect itself against the risk of unsatisfactory performance by bargaining for a warranty. Alternatively, it may choose to forego warranty protection in favor of a lower purchase price for the product. Subsequent purchasers may do likewise in bargaining over the price of the product. In any event, because persons other than the owner of the product will not incur economic losses resulting from the product's poor performance, the costs associated with economic loss will likely be reflected in the price of the product. There accordingly would seem to be no need to internalize these costs through a non-price mechanism such as strict liability.

The same considerations, by their very nature, prevent recovery by a plaintiff for purely economic loss in a negligence action; and a great many courts have so held. *E.g., Jones & Laughlin Steel Corp.,* 626 F.2d at 286–89; *Argo Welded Products, Inc. v. J.T. Ryerson Steel & Sons, Inc.,* 528 F.Supp. 583, 586 (E.D.Pa.1981); *A.C. Hoyle Co. v. Sperry Rand Corp.,* 128 Mich.App. 557, 340 N.W.2d 326, 327–29 (1983); *National Crane Corporation v. Ohio Steel Tube Company,* 213 Neb. 782, 786–90, 332 N.W.2d 39, 44 (1983); *Kaiser Steel Corp. v. Westinghouse Electric Corp.,* 55 Cal. App.3d 737, 746–48, 127 Cal.Rptr. 838

(1976); *Long v. Jim Letts Oldsmobile, Inc.,* 135 Ga.App. 293, 295, 217 S.E.2d 602, 604 (1975). As stated by the Illinois Supreme Court in *Moorman, supra,* 61 Ill. Dec. at 753, 435 N.E.2d at 450:

> Our conclusion that qualitative defects are best handled by contract, rather than tort, law applies whether the tort theory involved is strict liability or negligence. Tort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence of the nature described above. The remedy for economic loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract.

The commentators are overwhelmingly in accord. *See, e.g.,* W. Prosser, *The Law of Torts,* § 101 at 665 (4th ed. 1971); Turner, *The Vexing Problem of Purely Economic Loss,* 4 Seton Hall L.Rev. 145, 155 (1972). *Cf.* Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.L.Rev. 917, 929 (1966). And, the rule seems particularly apposite where, as here, the contracting parties are of comparable economic strength; dealt at arm's length in an exclusively commercial setting; and vigorously negotiated the terms of the bargain and the specifications of the product.

█ In sum, the better rule seems undeniably to be that the law of contracts is the vehicle of choice to redress a purchaser's unrequited expectations of product efficacy, at least where (as here) the parties are in privity of contract and have had ample opportunity to allocate the risks involved. In those regrettable instances where the product turns sour and proves to be a lemon, dulcification should flow from the terms of the bargain, not from the vagaries of negligence law. To permit recovery of purely economic losses in such circumstances would, unless by happy coincidence such recovery was consistent with the agreement between the contracting parties, undermine the very foundations upon which business transactions have historically been built. Thus, to couple product disappointment with traditional notions of tort recoupment in such a context would be to mix matter and anti-matter; the resultant amalgam would be much too volatile to make sense in a commercial setting.

█ It is true that there is some meagre authority for a contrary view. *See, e.g., Mead Corp. v. Allendale Mutual Insurance Co.,* 465 F.Supp. 355, 362–67 (N.D. Ohio 1979) (Ohio law); *Berg v. General Motors Corp.,* 87 Wash.2d 584, 592–94, 555 P.2d 818, 823–25 (1976).[15] Yet, not only are the vast bulk of the decided cases opposed to this adventurous approach, but the signs are strong that the courts of Massachusetts and Pennsylvania would lean in the other direction, toward the generally accepted analysis. *See* notes 12 & 13, *ante.* And, the Rhode Island Supreme Court, which has repeatedly demonstrated "a willingness to adopt the majority approach" in tort law matters, *Plummer,* 568 F.Supp. at 926 (collecting representative cases), has made manifest that its embrasure of products liability theories is not intended to diminish the vitality of contracts principles nor to rend the fabric of warranty rules which govern commercial dealings. *E.g., Romano v. Westinghouse Electric Co.,* 114 R.I. 451, 336 A.2d 555 (1975). The preponderance of the authorities is so heavy that no meaningful argument can be made, especially to a federal court sitting in diversity jurisdiction, *cf. Dayton v. Peck, Stow & Wilcox Co.,* 739 F.2d 690, 694–695 (1st Cir. 1984), that the highest tribunals of any of the three interested jurisdictions would depart from the line of descent formed by *Seely* and its progeny. None of the three states in question has, either judicially or legislatively, semaphored any intention radically to alter settled thinking in this area. Hart's case, insofar as it sounds in tort, is at bottom an endeavor to blaze new state law trails at variance with the weight of

---

**15.** Hart's reliance on *Cova v. Harley Davidson Motor Co.,* 26 Mich.App. 602, 182 N.W.2d 800 (1970) appears misplaced, in light of the more recent pronouncements of the Michigan Court of Appeals in *A.C. Hoyle Co., supra.*

authority. As such, it cannot hold sway in this forum. *Dayton, supra; Burten v. Milton Bradley Co.*, 592 F.Supp. 1021, 1036–1037 (D.R.I.1984); *Plummer, supra.* Here, as in *Dayton,* there is "no basis for applying any rule other than the traditional one." *Dayton,* at 694–695 (footnote omitted).[16]

The clarion call of the clear clarone of cogent and compelling caselaw conveniently conduces to clarification of the commercial character of the crippled clarifiers. FMC, while arguably the source of expenses arising out of the plaintiff's disappointment with the goods, cannot be held liable on these facts as a tort-feasor. Since the damages which Hart claims in this suit consist solely of items of economic loss growing out of a qualitative flaw in the clarifiers, they are not recoverable under the third or fourth counts of the complaint.

### IV.

Having applied the respirometer of the law to the viscous mix at bar, the court is constrained to conclude that the plaintiff's case is composed largely of sludge, and that Hart's travails do not lend themselves to facile recycling in an effort to shift expenses to FMC. Based on the findings of fact and conclusions of law set forth herein, the plaintiff's action must be, and it hereby is, dismissed with prejudice. The clerk is directed forthwith to enter judgment for the defendant for costs.

*So ordered.*

---

**16.** Disposition of the negligence initiative on this ground renders it unnecessary to decide whether or not Hart's claims in this respect are also barred by condition twelve of the purchase agreement (which, as noted above, *see* text *ante* at 1475, disclaims liability for consequential damages "occasioned by or arising out of the operation, use, installation, repair or replacement of the equipment or otherwise ...").