MOBILE HOUSING, INC., Appellant,

v.

M. F. STONE et ux., Appellees.

No. 18034.

Court of Civil Appeals of Texas,
Dallas.

Feb. 1, 1973.

J. C. B. Aler, Weinberg, Sandoloski & Hines, Dallas, for appellant.

Daniel J. Smith, Rudd & Smith, Grand Prairie, for appellees.

BATEMAN, Justice.

This case involves the right of purchasers to rescind a contract for the sale to them of a mobile home. By a written contract dated June 6, 1970 appellant Mobile Housing, Inc. sold to appellees Mr. and Mrs. M. F. Stone a mobile home for $1,000.46 down payment and the balance in monthly installments. When the home was delivered appellees promptly rejected it as not conforming to the contract and sued to cancel the contract and to recover their down payment. Appellant repossessed the home and filed a counterclaim. At the conclusion of a nonjury trial the court awarded judgment to appellees for $1,000.-46, and decreed that appellant take nothing by its counterclaim.

The trial court filed findings of fact, including the following: that prior to exe-

cuting the contract appellant showed appellees a sample and model mobile home (spoken of in the record as Unit No. 103) to illustrate what appellees would receive; that the said mobile home did not conform to the purchase agreement, or to the model and sample exhibited to appellees by appellant, which induced appellees to purchase the home; that appellees refused to sign an acceptance of the home but rejected same within a reasonable time and immediately notified appellant that the home did not conform to the contract; that appellant wholly failed to correct defects in the said mobile home; that the home was delivered by appellant on July 20, 1970 and picked up by it approximately twelve weeks later; that appellee did not observe the mobile home after appellant completed its repair work, and that after completion of the repair work the mobile home conformed to Unit No. 103 with the following exceptions: size of bedroom windows, and carpet had not been removed from bathroom; that appellant offered to purchase furnishings for the home but the offer was refused.

The trial court made the following conclusions of law: (1) that the mobile home delivered to appellees did not conform to the purchase agreement or the model and sample shown and demonstrated to appellees; (2) that appellant failed and refused to reasonably or seasonably cure the defects existing in the mobile home; (3) that appellees never accepted said mobile home but rejected it within a reasonable time after delivery; (4) that the mobile home did not comply with the expressed and implied warranties; (5) that appellees reasonably and rightfully cancelled the purchase agreement, and (6) should therefore recover $1,000.46 from appellant; and (7) that appellant did not, within the meaning of Section 2.313 of the Business and Commerce Code, make a sample or model a part of the basis of the bargain with the exception of furnishings in the mobile home.

By its first four points of error on appeal the appellant contends that there is no evidence and insufficient evidence to support the award to appellees, and also argues that the judgment is contrary to and not supported by the court's findings of fact and conclusions of law, some of which are inconsistent. Appellant points to the following provisions in the Purchase Agreement:

"It is mutually agreed the buyer takes the new mobile home, trailer or other described unit, 'as is' and that there are no warranties, either expressed or implied, made by the dealer. The seller specifically makes no warranty as to its merchantability or of its fitness for any purpose.

    \*     \*     \*     \*     \*     \*

It is further agreed that there have been no descriptions, samples or models used or regarded as a part of this contract."

The law pertaining to sales of personal property in Texas underwent some rather drastic changes when the Uniform Commercial Code was first adopted in 1965 and made a part of the Business and Commerce Code in 1967. Prior to 1965 the law in Texas was that, in the absence of fraud, if the seller's warranty went to the degree of fitness or to quality, and the article proved to be of an inferior quality or fitness, the goods could not be returned; that if the article was sold for a particular purpose, and it would perform none of the functions, it could be returned; but if it only performed them badly the remedy was by action for damages; and the fact that some parts of the article might be defective, or that the machine did not perform as guaranteed would not warrant a rescission of the contract, so long as the article was not wholly worthless. Refinery Equipment, Inc. v. Wickett Refining Co., 158 F.2d 710, 714 (5th Cir. 1947), citing Wright v. Davenport, 44 Tex. 164 (1875), and Chastain v. Gilbert, 145 S.W.2d 938 (Tex.Civ.App., Eastland 1940, no writ). See also 37A Tex.Jur., Sales, § 311, p. 640.

Now, however, under the Texas Business and Commerce Code, "if the goods or the tender of delivery fail *in any respect* to conform to the contract, the buyer may (1) reject the whole; or (2) accept the whole; or (3) accept any commercial unit or units and reject the rest." (Italics ours) V.T.C. A., Bus. & C., § 2.601.* Rejection must be within a reasonable time after delivery or tender of the goods, and is ineffective unless the buyer seasonably notifies the seller. § 2.602. The seller has a right, where the tender or delivery is rejected because non-conforming and the time for performance has not yet expired, to seasonably notify the buyer of his intention to cure and then within the contract time make a conforming delivery. § 2.508(a). If the buyer has rightfully rejected the goods he may cancel the contract and recover so much of the price as has been paid. § 2.711.

Our review of the judgment here appealed from must be within the rules laid down by our Supreme Court in Brown v. Frontier Theatres, Inc., 369 S.W.2d 299, 301 (Tex. Sup.1963), as follows:

"In determining whether the trial court's findings are supported by any evidence of probative value, we will give credence only to the evidence favorable to the findings and will disregard all evidence to the contrary. The findings of fact and the conclusions of law will be construed together; and if the findings of fact are susceptible of different constructions, they will be construed, if possible, to be in harmony with the judgment and to support it."

Looking at the evidence in this light, we find competent testimony to the effect that appellees visited appellant's sales lot numerous times before deciding on the purchase, that on each occasion the salesman Ken Bowdon used a mobile home on the lot as a model of the one he was endeavoring to sell them. The salesman testified that in preparing the contract they took the description of the mobile home from the one that was sitting on the lot; that the contract "goes on to describe what will be in the house and it will be as is on the —as they looked at it on the lot," and that the description of the mobile home, together with the accessories and additional equipment definitely should and ordinarily would "have been a match-up with the one they were shown on the lot." It also appears from the testimony of the salesman and that of Mr. and Mrs. Stone that the carpet in the home tendered to them was quite different from that in Unit No. 103, that the shelving in the cabinets in the tendered home was unlevel due to poor cabinet work, and that the windows in the back bedroom of Unit 103 extended from the ceiling to the floor and sliding doors were between the bathroom and the two bedrooms, as well as "real nice long shag carpet," but that the home tendered to them had a very small bedroom window, no sliding doors connecting the bathroom with the two bedrooms, and "had short stubby shag" carpet. It also appeared from appellees' testimony that the furniture in Unit 103 "was extra nice Belvedere furniture," whereas in the tendered home there was no furniture at all. Other defects were that in the tendered home there were "four big cuts in the linoleum covering on the [kitchen] floor," the door to the kitchen "opened backwards"; that two cabinet doors were missing; that the cabinets were made of different materials than those on the walls; i. e., it "just looked like pieces of scrap. The edges were uneven * * * it had raw edges sticking out where they butted two pieces of material together * * * And underneath the cabinet, they had a shelf over there for setting your drain things on. They had just taken a— looked like a hatchet and chopped a hole in it to put a drainpipe to go through it," none of which things were in Unit 103. Mr. Stone further testified that the hardware was "all mismatched on the doors

and the cabinet doors," being of different colors and different designs; that in the back bedroom the closets were so wide that the hall door wouldn't open all the way, all of which was different from the home they had ordered; that they had wanted no carpet in the bathroom, but the tendered home had carpet in the bathroom and that one door on the master bedroom was on backwards, opening out into the hall in such manner as to prevent placing a table at the end of the hall as it was in the display home; that the doors on the closets were made of different materials, being green colored, and they did not fit; that the drapes in the front room didn't fit; and that at the time of delivery Stone told the appellant's representative that under no circumstances would he accept the tendered home as it was, to which the representative replied that the company "would fix them, that it would be just like the display when they got through with it." Other differences were that, whereas the display model had locks on the doors, the tendered home did not; that after the two sections of the home were put together the roof leaked causing the bay window seat and paneling to buckle; that the delivered home was not level, and when they tried to level it the aluminum "skin" of the house would buckle.

Stone also testified that a serviceman came out and tried to correct the defects but, except for changing the doors and joining of the two sections, nothing was done to correct the defects, and that in September, 1970 appellant picked up the mobile home and Stone never saw it again; that he at no time accepted the home, but specifically refused to do so, and did not at any time move into the home or make any of the monthly payments thereon.

In our opinion, the trial court's findings of fact are supported by evidence of probative value and, if the findings of fact are susceptible of different constructions, we should construe them to be in harmony with the judgment and to support it. Brown v. Frontier Theatres, Inc., supra.

The conclusion is inescapable, it seems to us, that appellees' agreement to buy the mobile home was induced by and based upon their numerous inspections of Unit No. 103 on appellant's sales lot and the representations of appellant's salesman that the home he was trying to sell them would be precisely like it. There is no evidence that they had ever seen the home they were buying, or even a picture of it, or that the salesman described it in any other manner than by referring to Unit No. 103. The salesman testified that in drawing the contract they took the description from this Unit 103.

Section 2.313 provides:

"(a) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(b) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, * * *."

We hold that appellant made express warranties, within the meaning of § 2.313(a)(2), (3), that the mobile home would conform to the description given by the salesman and the model called Unit No. 103. It is true, the written contract provides that the article is sold "as is" and

disclaims all warranties, either express or implied, and the use of descriptions, samples or models as a part of the contract. However, we hold that these express warranties rest on "dickered" aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in the purchase agreement are repugnant to the basic dickered terms. See Comment 1 under § 2.313.

■ The Code according to Comment 4 under § 2.313 seems to take the view that the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell, and refuses except in unusual circumstances to recognize a material deletion of the seller's obligation. Thus, a contract is normally one for a sale of something describable and described. A clause generally disclaiming "all warranties, express or implied," cannot reduce the seller's obligation with respect to such description and therefore cannot be given literal effect under § 2.316.

Section 2.316 provides in subsection (a) that if words or conduct creating an express warranty cannot reasonably be construed as consistent with words or conduct tending to negate or limit the warranty, the warranty shall predominate and negation or limitation is inoperative to the extent that it is unreasonable. This provision is subject to the rules set forth in § 2.202.

Section 2.202 provides, in part, that terms of a written agreement intended by the parties as a final expression of their agreement may not be contradicted by evidence of a prior agreement or contemporaneous oral agreement, but may be explained or supplemented by evidence of consistent additional terms unless the court finds the writing to have been intended as a complete and exclusive statement of the terms of the agreement. It cannot be seriously contended that the written contract here was intended "as a complete and exclusive statement of the terms of the agreement."

On its face it begins with the agreement of appellant to sell, and appellees to buy, a new 1970 white and gold "Imperial" with three bedrooms. A blank provided under "stock numbers" is filled in with "open," while a blank following "Serial Number" is completed with "Order." Blanks provided after "proposed delivery date" and "key numbers" have not been filled in. The only other effort to describe the home consists of several entries written into blanks provided under an "optional equipment" portion of the agreement. The additional items set out include blue shag carpeting except for the bathroom which is not to be carpeted, avocado kitchen appliances, certain bathroom fixtures, light birch paneling throughout, full furnishings as displayed on the lot as Unit No. 103, and a house-type door at the rear. This description is so incomplete as to be ambiguous.

■ Another ambiguity appears in the agreement concerning descriptions, samples and models. In one printed section of the contract "it is further agreed that there have been no descriptions, samples, or models used or regarded as part of this contract" while in the "optional equipment" section noted above the following language appears: "The house will be fully furnished as displayed on lot as Ser. #103." This language indicates that Unit No. 103 had in fact been represented as a model or sample to the Stones. It follows that parol testimony was properly admitted to remove the said ambiguities with respect to the description of the subject matter of the contract.

■ Appellant argues that, except for the difference in size of the bedroom windows and removal of the carpet from the bathroom, it seasonably cured the defects complained of by appellees. § 2.508 provides that this may be done if the seller seasonably notifies the buyer of his intention to cure and makes a conforming delivery within the contract time. However, we find in the record before us no plead-

ing that appellant seasonably notified appellees of its intention to cure the defects complained of, or that they were cured. This was an affirmative defense, required by Texas Rules of Civil Procedure 94 to be pled specifically. However, appellant pled only the general denial. The defense was therefore waived. Chapman v. Tyler Bank & Trust Company, 396 S.W.2d 143, 147 (Tex.Civ.App., Tyler 1965, writ ref'd n. r. e.). Moreover, both Mr. and Mrs. Stone testified that they were never notified that the mobile home had been repaired, or told to observe it in a repaired state. The trial court found that appellees did not observe the home after the repair work was completed. Appellant's service man testified that he did not do any repair work on the home until September 14, 1970, which was nearly two months after it had been delivered and definitely rejected by appellees. Even if appellees had been notified of an intention to cure the defects, appellant is faced with the trial court's finding that it failed to cure them. Therefore, we hold that appellant's breach of its express warranty and its non-conforming delivery were not cured within the meaning of § 2.-508.

█ Appellant argues that the trial court's conclusion of law No. 7, that appellant did not, within the meaning of § 2.313, make a sample or model a part of the basis of the bargain (with the exception of furnishings), being filed subsequently to the filing of findings of fact in conflict therewith, must control. It cites Hood v. Adams, 334 S.W.2d 206, 208 (Tex.Civ.App., Amarillo 1960, no writ). In that case it was held that where the court filed one set of fact findings, and later filed additional findings in conflict therewith, the subsequent findings prevail. Here, however, we have a conclusion of law filed after the filing of certain findings of fact. This conclusion of law is not only not supported by the findings of fact but is contrary to the undisputed evidence, including the testimony of appellant's own salesman who made the sale to appellees. We therefore

disregard this erroneous conclusion as surplusage.

In its fifth and last point of error appellant complains of the denial of its counterclaim for damages suffered as a result of appellees' breach of the contract. As we have held that appellant, not the appellees, breached the contract and that appellees rightfully rejected the mobile home tendered to them, it follows that they are not liable to appellant for damages claimed. The fifth point of error is overruled.

Affirmed.