356 So.2d 347 (1978)
TAMPA FARM SERVICE, INC., Appellant,
v.
CARGILL, INC., Appellee.
No. 77-167.
District Court of Appeal of Florida, Second District.
February 24, 1978.
Rehearing Denied April 10, 1978.
*348 Michael C. Addison and George E. Copple of Trenam, Simmons, Kemker, Scharf & Barkin, Tampa, for appellant.
Arthur A. Simpson, M.W. Graybill and Charles W. Pittman of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellee.
SCHEB, Judge.
Appellant Tampa Farm Service assails the trial court's summary final judgment finding it liable for having wrongfully canceled certain contracts for the purchase of corn from appellee Cargill. Tampa Farm contends summary judgment was improper because a material factual issue was present as to whether cancellation of the contracts was justifiable. We agree and reverse.
Appellant Tampa Farm is in the business of selling eggs produced by approximately a million chickens on its various owned and contract farms around the Tampa Bay area. Tampa Farm feeds its chickens a mixture which includes milled yellow corn. The corn is marketed in six separate grades, viz., 1, 2, 3, 4, 5, and sample, as determined by certain federal regulations. Number 1 is the highest grade of corn and sample is the lowest.
On October 15, 1974, appellee Cargill, a wholesale grain distributor, and Tampa Farm entered into a series of contracts whereby Cargill agreed to deliver a total of 600,000 bushels of No. 2 yellow corn to Tampa Farm. The contracts were identical in form, varying only with respect to quantity, price, and delivery dates. Each contract specified that it was to be governed by the Rules of the Grain and Feed Dealers National Association (GFDNA), and by the Uniform Commercial Code (UCC) to the extent not in conflict with these Rules. The GFDNA Rules limited the buyer's remedies for nonconforming shipments of corn to those contained in the Rules, and specifically *349 provided that the buyer could not rescind the entire contract because of nonconforming shipments.
Deliveries commenced in early January 1975. In late January or early February Tampa Farm refused to accept further deliveries, claiming that it was receiving corn inferior to the No. 2 grade Cargill had contracted to furnish. Negotiations ensued and resulted in the parties entering into an additional agreement in March 1975 which modified the original contracts in several respects. In the modification Cargill agreed to give Tampa Farm a discount on the corn it had already received. Additionally, Cargill agreed that it would furnish unofficial inspection certificates on all future deliveries to assure Tampa Farm that it was receiving No. 2 corn. Deliveries resumed in early April and continued until July 7, 1975, when Tampa Farm canceled the contracts.
Several weeks later Cargill sued Tampa Farm on two counts. In Count I Cargill sought recovery of the contract price for the corn it sold and delivered before the contracts were canceled. In Count II Cargill sought damages for Tampa Farm's wrongful cancellation of the contracts as related to future deliveries. Tampa Farm set up as a defense that Cargill had anticipatorily breached the contracts by delivering corn far inferior to No. 2. Tampa Farm contended that it was therefore justified in canceling because it reasonably believed that Cargill would not or could not continue to perform the contracts in the future. Cargill was awarded a summary judgment for $389,392.86 plus interest on Count I in March 1976, from which no appeal has been taken. In December 1976 summary judgment was also entered in favor of Cargill on Count II for $318,573.06 plus interest. Tampa Farm appeals this latter summary judgment.
In the face of a record which disclosed disputed evidence on the issue of whether Tampa Farm could cancel its contracts as related to future deliveries, the trial court entered summary judgment in favor of Cargill. In doing so the trial court implicitly determined, as a matter of law, the remedies provided by the GFDNA Rules for nonconforming shipments were exclusive. The court, in effect, held that Tampa Farm had no right to cancel the contracts.
The relevant GFDNA Rules provided:
Rule 17. Off Grades: It shall be the duty of receivers, track buyers, and distributors of grain on regular market terms, to exercise due diligence in seeing that cars are promptly inspected on arrival, and on any cars which fail to grade according to the contract terms, notify the seller of such failure to grade by a telephone call placed, or by a telegram filed not later than twelve o'clock noon of the next business day after the date of official inspection, reporting the grade of the grain; whereupon it shall be the duty of the seller receiving such notice to agree upon a discount with the buyer, or to wire disposition at once. Off grade grain sold for the account of shippers, shall not apply on contract.
Replacement shall be shipped within ten (10) calendar days.
Rule 43. Refusal of shipment: Failure to make any shipment in keeping with the terms and conditions of a contract shall be grounds for the refusal only of such shipment or shipments, and not for the rescission of the entire contract or any other contract between Buyer and Seller. (Emphasis added.)
At the outset, Tampa Farm contends the remedies made applicable to its contracts by Rules 17 and 43 were never meant to be exclusive. But, it argues, even if so intended, these remedies failed of their "essential purpose," and resort could be had to the remedies provided by the UCC, including cancellation. Section 672.719(2), Florida Statutes (1975) (Section 2-719[2] of the UCC). Tampa Farm contends that the record demonstrated an issue of fact as to whether the contract remedies failed, and therefore the trial court erred in depriving it of a trial on this issue. We agree. Whether Tampa Farm should prevail is not now before us; however, we think that Cargill did not carry its burden of showing *350 that there was no issue of material fact as to whether the remedies provided by the Rules failed of their essential purpose. This being so, the trial court erred in granting the summary final judgment. Fla.R. Civ.P. 1.510. See Stewart v. Gore, 314 So.2d 10 (Fla.2d DCA 1975).
Tampa Farm argues that to utilize the remedies provided by the GFDNA Rules, it had to follow a very cumbersome procedure. First, the truck loads of corn received had to be placed in separate and identifiable storage bins. Samples then had to be taken and sent to a grain inspection station at Live Oak. After the official grain inspection certificates were received, Tampa Farm then had to notify Cargill of each nonconforming shipment. Finally, at that point Cargill had the option of either replacing the substandard corn or awarding a discount.
Among the depositions on file when the summary judgment was entered was one from Herbert Bynum, president of Tampa Farm. Bynum testified in his deposition that his company only had storage facilities for 8,000 bushels of corn, yet used approximately 15,000 bushels of corn per week. This, he said, made it impossible to effectively utilize the unwieldy process outlined. Bynum did admit that on several occasions Tampa Farm had sent corn back and Cargill had replaced it. He further said, however, that even after the March 1975 amendment Cargill continued to ship substandard corn. He pointed to the fact that Tampa Farm had twelve shipments tested, and the official grain certificates showed that only one of the twelve was of No. 2 quality. This, he explained, was why Tampa Farm canceled the contracts. After cancellation fourteen additional inspection certificates were received on shipments that arrived prior to cancellation. All fourteen certificates showed the corn to be below No. 2 grade. Thus, twenty-five of the twenty-six shipments tested between May and June of 1975 were below the quality Cargill contracted to furnish. Mr. Bynum put great emphasis on the fact that the quality of corn was of paramount importance, as inferior corn adversely affected egg production.
Cargill correctly points out that the remedies provided by the UCC may be modified by contract. Section 672.719(1)(a), Florida Statutes (1975). We recognize that the parties by incorporating the GFDNA Rules apparently intended to do just that. However, even when the parties agree upon a particular remedy, resort can be had to the additional remedies of the UCC if the agreed-upon remedy fails of its "essential purpose." Section 672.719(2), Florida Statutes (1975).
There is, unfortunately, scant authority in the law as to examples of when a remedy fails of its essential purpose. In Wilson Trading Corp. v. Ferguson, Ltd., 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968), the buyer purchased a large amount of yarn for its sweater business. There the contract provided the buyer's only remedy for defective yarn was replacement, so long as seller was notified of the defect before the yarn was knit. However, the defects buyer complained of were undiscoverable until after the yarn was knit into sweaters. The court held that the remedy provided by the contract failed of its essential purpose, and resort could be had to the remedies provided by the UCC.
On occasions courts have addressed the issue of whether there had been a failure of the essential purpose of a remedy where a buyer has purchased an automobile from a dealer or manufacturer. Most typically, the buyer's remedy was limited by contract to either repair or replacement of defective parts. Soon after purchasing the car the buyer experienced difficulties that the dealer, after repeated attempts, was unable to repair. In these circumstances, courts have ruled that buyer's remedies were not limited to those in the contract, and that resort could be had to the remedies of the UCC. E.g., Riley v. Ford Motor Co., 442 F.2d 670 (5th Cir.1971). See also Orange Motors of Coral Gables, Inc. v. Dade County Dairies, Inc., 258 So.2d 319 (Fla.3d DCA), cert. denied, Fla., 263 So.2d 831 (1972); General Motors Corp. v. Earnest, 279 Ala. 299, 184 So.2d 811 (1966). We realize that the facts *351 in the instant case are somewhat different. Quite obviously this case involves a perishable farm product as opposed to an automobile. Moreover, unlike previously mentioned cases, Cargill replaced the substandard corn when given the opportunity. However, the basic rationale of these cases seems to be that the repeated necessity to utilize a prescribed remedy without appreciable results in correcting the defect can cause a remedy to fail. Here we think there was a genuine issue of material fact present as to whether Cargill's failure to furnish the grade of corn agreed upon, even after the contract modification, caused the remedies provided by the Rules to fail.
In the instant case there was evidence that even though the difference between No. 2 and sample corn could sometimes be detected by the naked eye, the difference between No. 2 and No. 4 corn was not so easily discernible and tests were required in such instances. This, added to the evidence that Tampa Farm did not have adequate storage facilities to allow it to test the corn, bolsters our view that there was an issue as to whether the remedies provided failed of their essential purpose.
In White & Summers, Uniform Commercial Code, Section 12-10 (1972), the authors state that a remedy fails of its essential purpose only when circumstances arising since the inception of the contract cause the remedy to fail; that is to say, there must be changed circumstances. We doubt that either Cargill or Tampa Farm could have foreseen the situation which arose. We find that such a drastic failure of the quality of corn shipped could not reasonably have been anticipated by the parties when the contracts were entered into, and therefore could be construed as changed circumstances. After all, this was not a case of several isolated discrepancies. Twenty-five out of twenty-six shipments tested were below No. 2 quality. This issue needs to be explored through trial; it is not susceptible to judicial determination on summary judgment.
One last point needs to be addressed. Tampa Farm's defenses included an allegation that Cargill had promised by the March 1975 amendment to inspect all corn before it was sent; that Cargill supplied unofficial inspection certificates for each shipment attesting that it was of No. 2 quality; and, that Tampa Farm relied upon these representations when in fact the corn shipped was a far inferior grade. Tampa Farm contends these allegations were sufficient to allege fraud, and that the trial court erred in granting summary judgment on this point as well. We do not agree. To begin with, the facts and circumstances constituting a fraud must be pled "with certainty, clarity, directness, and particularity." 14 Fla.Jur. Fraud and Deceit, Section 64 (1957), and cases cited therein. The allegations must include the intent to deceive in order to state a cause of action in fraud. Houchins v. Case, 138 Fla. 368, 189 So. 402 (1939). Tampa Farm's allegations fell short of this mark.
On remand the trial court, upon request, may permit an amendment to Tampa Farm's defense to allow it to properly recast its allegation of fraud.
Summary judgment on Count II is hereby vacated and this cause is remanded for further proceedings consistent with this opinion.
GRIMES, A.C.J., and OTT, J., concur.