**ARKWRIGHT–BOSTON MANUFACTUR-ERS MUTUAL INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**WESTINGHOUSE ELECTRIC CORP., Defendant–Appellee.**

No. 87–1139.

United States Court of Appeals, Fifth Circuit.

May 17, 1988.

Michael Sean Quinn, Robins, Zelle, Larson & Kaplan, Dallas, Tex., for plaintiff-appellant.

Joseph L. Hood, James L. Gallagher, El Paso, Tex., for defendant-appellee.

Before GOLDBERG, POLITZ and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

This diversity action results from a broken blade in an electrical turbine. The broken blade caused extensive damage to the turbine. The defendant manufactured and sold the turbine. The turbine's purchaser procured insurance for the turbine from the plaintiff. The magistrate granted the defendant's motion for summary judgment, and the plaintiff appeals. Finding no error, we affirm.

## I. FACTS

*1. One nonparty and the parties.* El Paso Electric Company ("El Paso") has provided electric power in the El Paso area for over eighty years, and operates three power stations with eleven turbines. Although El Paso is not a party, this case concerns one of El Paso's turbines, a W–501B4 Econo–Pac combustion turbine generating unit ("the Turbine"). El Paso purchased the Turbine from the defendant-appellee, Westinghouse Electric Corp. ("Westinghouse"), pursuant to their December 20, 1977 contract ("the Contract"). The plaintiff-appellant, Arkwright–Boston Manufacturers Mutual Insurance Company ("Arkwright"), insured El Paso against damage to the Turbine. Arkwright seeks recovery from Westinghouse, in contract and tort, for payments it made to El Paso for damage to the Turbine.

*2. El Paso's purchase of the Turbine.* In 1976, El Paso decided to build a new power station, the Copper station. Four manufacturers, including Westinghouse, submitted proposals for a turbine for this new station. In January 1977, El Paso selected a Westinghouse proposal ("the Proposal") which was later attached to the Contract as Exhibit B. Subsequently, Westinghouse and El Paso engaged in several months of extensive contract negotiations. During this negotiation period offi-

cials of El Paso and El Paso's in-house counsel reviewed drafts of the Contract and met with Westinghouse officials. The El Paso personnel involved in these negotiations had prior experience in negotiating turbine purchase contracts. In the summer of 1977 they reached an agreement on contract terms. On December 20, 1977, Westinghouse and El Paso executed the Contract for El Paso's purchase of the Turbine from Westinghouse at a price of $6,853,000.

*3. The Turbine's failure.* The Turbine contained four rows of blades which were similar to propeller blades. On October 19, 1981, a fourth row blade in the Turbine broke. The broken blade damaged the Turbine but neither damaged any other property nor caused any injuries. Repair of the damage to the Turbine cost El Paso $813,-223.61. El Paso made no claim under the warranty provision of the Contract with Westinghouse; by the time that the blade broke the contractual warranty period had expired.

When turbine blades operate at, or near, the blades' natural resonance point resulting vibratory stresses may cause the blades to break. Manufacturers generally design turbine blades so that the blades do not vibrate at their natural frequency. Vibrations at, or near, the natural frequency of the fourth row blades caused the Turbine's blade to break.

Three similar failures occurred in turbines sold by Westinghouse before the December 1977 Contract for the purchase of the Turbine. A total of seven similar failures had occurred in the Westinghouse turbines before Westinghouse shipped the Turbine to El Paso in July 1979. By October 1981, when the blade broke, a total of ten similar failures had occurred in Westinghouse turbines.

Westinghouse disclosed the potential problem in a presentation at the December 1978 Gas Turbine User's Conference. El Paso personnel attended this conference and heard the Westinghouse presentation. In addition, Westinghouse discussed the potential problem in a 1979 Product Improvement Bulletin sent to El Paso. Although both of these disclosures included a representation that operation within normal limits would not lead to any problem, El Paso planned to replace the fourth row blades at the Turbine's next scheduled maintenance outage.

*4. Arkwright's payment.* El Paso had a policy of insuring its generating equipment. In accordance with this policy El Paso had procured insurance for the Turbine from Arkwright. This insurance became effective June 5, 1980 and covered "damage to the ... [Turbine] which necessitates repair or replacement of the [Turbine]." El Paso made a claim under this policy for the repair cost of $813,223.61. Arkwright subtracted the $468,000.00 policy deductible and paid El Paso the remaining $345,223.61 expended for the repairs.

*5. Disposition below.* Arkwright properly invoked federal diversity jurisdiction. 28 U.S.C. § 1332(a)(1). Pursuant to 28 U.S.C. § 636(c), Westinghouse and Arkwright agreed to adjudication of this case by a magistrate. The magistrate determined that Texas law governs Arkwright's claims. On appeal neither party disputes this determination.

The magistrate granted Westinghouse's motion for summary judgment. Summary judgment was proper if Westinghouse showed that there was "no genuine issue as to any material fact" and that it was "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing the magistrate's decision we apply the same general standard. *Gatx Aircraft Corp. v. M/V Courtney Leigh,* 768 F.2d 711, 714 (5th Cir.1985); *McCrae v. Hankins,* 720 F.2d 863, 865 (5th Cir.1983). We view the record and inferences from the facts in the light most favorable to Arkwright, the non-moving party. *Gatx Aircraft,* 768 F.2d at 714.

Arkwright makes tort claims based on negligence and warranty claims under the Contract. In addition, Arkwright makes tort and warranty claims based on an implied-in-fact services contract that Arkwright alleges arose after the Contract. The magistrate concluded that summary judgment was proper in this case because

the terms of the Contract and applicable tort and contract law precluded recovery by Arkwright.

## II. NEGLIGENCE CLAIMS

■ Arkwright alleged that Westinghouse was negligent (1) in designing the Turbine, (2) in misrepresenting the effects of the design defect,[1] (3) in failing, after installation, to adequately warn of the design defect, and (4) in failing to unilaterally replace the fourth row blades with modified fourth row blades before installation. For purposes of summary judgment, Westinghouse's negligence is presumed. Arkwright's only claim for damages, however, was for economic loss[2] from damage to the Turbine itself. The magistrate granted Westinghouse's summary judgment motion on these negligence claims on two alternative grounds. First, the magistrate held that Texas law does not permit recovery under a negligence theory for economic loss resulting from damage to a defective product. Second, the magistrate held that the Contract's terms barred Arkwright's tort claims. Finding the magistrate's conclusion on the first issue correct, we need not discuss the magistrate's alternative holding that the Contract terms barred Arkwright's negligence action.

The leading Texas Supreme Court case on recovery for economic loss under a negligence theory is *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex.1986). In *Jim Walter Homes v. Reed* the court rejected the Reeds' attempt to recover for defects in their home under a negligence theory. The court held that "when the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone."[3]

Arkwright urges that we distinguish *Jim Walter Homes* because the Reed's home simply did not fit together well, while El Paso's Turbine "suddenly and catastrophically failed." The Texas Supreme Court has given no indication that it would make such a distinction. Indeed the indications are to the contrary. First, the Texas Supreme Court used broad, all inclusive language in *Jim Walter Homes*. Second, the *Jim Walter Homes* court cited two products liability cases to support its holding. One, *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977), dealt with another mobile home that simply did not fit together well. The second, *Mid Continent Aircraft Corp. v. Curry County Spraying Service*, 572 S.W.2d 308 (Tex. 1978), dealt with a sudden catastrophic failure in an airplane.[4] The *Mid Continent* court, "while recognizing that the product had caused physical harm to itself, accepted the argument that there is 'no differ-

---

**1.** At oral argument, Arkwright's counsel specifically stated that the facts would not support, and Arkwright was not making, a fraud claim.

**2.** In *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977), the Texas Supreme Court noted that economic loss can be either direct or consequential and defined the two types as follows:

Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be "out of pocket"—the difference in value between what is given and received—or "loss of bargain"—the difference between the value of what is received and its value as represented. Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product. *Id.* at 78 n. 1 (quoting Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L. Rev. 917, 918 (1966)); *see Mid Continent Aircraft Corp. v. Curry County Spraying Service,*

*Inc.*, 572 S.W.2d 308, 312–13 (Tex.1978) (characterizing economic loss as a loss to the purchaser of the benefit of the bargain with the seller and noting that the legislature has provided "that parties may rely on sales and contract law for compensation of economic loss to the product itself").

**3.** *Id.* at 618 (denying recovery for defects resulting from seller's gross negligence in supervision of home construction).

**4.** The *Mid Continent* court held:

In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code. [Plaintiff's] cause of action for the damage of the airplane lies in breach of warranty as provided by the Code.
*Id.* at 313. The *Mid Continent* court then held that the plaintiff could not recover for breach of warranty because the contract included a valid "as is" warranty disclaimer. *Id.*

ence between a product that is unusable because of a defect and one that causes physical harm to itself because of a defect.' " [5]

Sitting in diversity, our duty is to do, as best we can, what we think the state court would do.[6] There is simply no indication that a Texas court would adopt the distinction Arkwright urges, and we decline to do so. Summary judgment is rarely appropriate in a negligence action.[7] But this is simply not a negligence case. The magistrate found, and we agree, that Texas tort law would not allow Arkwright to recover in tort for its economic loss. We therefore affirm the magistrate's conclusion that, as a matter of law, Arkwright could not prevail on its negligence claim.[8]

### III. WARRANTY CLAIMS

Having found that Arkwright cannot recover in tort, we turn to Arkwright's warranty claims based on the Contract. Arkwright makes claims under both express and implied warranties.

### A. Express Warranty Claims

Article 5 of the Contract included five express warranty provisions in lettered sections A through E: (A) an equipment warranty; (B) a performance warranty;[9] (C) a warranty for technical services provided in

connection with installation; (D) a starting reliability warranty; and (E) a title warranty.

*1. Express equipment warranty claim.* Arkwright bases one of its express warranty claims on the Contract's equipment warranty. The equipment warranty provided:

WESTINGHOUSE warrants that equipment furnished will be free from defects and faults in workmanship and material and that the equipment and all material incorporated therein shall be new unless otherwise specified and will be suitable for operation as part of the Combustion Turbine System furnished under this Order or Contract.

The equipment warranty was only available for a specified period of time. The Contract provided:

Such warranty shall begin upon Provisional Acceptance ... and shall terminate twelve (12) months thereafter or twenty-one (21) months after shipment, whichever is earliest.

Provisional Acceptance of the Turbine occurred on June 30, 1980 when the Performance Test required in the Contract was completed. Twelve months after the date of Provisional Acceptance was June 30, 1981. Westinghouse had shipped the tur-

---

**5.** *James v. Bell Helicopter Co.,* 715 F.2d 166, 170–71 (5th Cir.1983) (concluding that Texas courts have "merged" the two types of economic loss) (quoting *Mid Continent,* 572 S.W.2d at 311). *See generally East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (admiralty case concluding that injury to the product itself does not state a claim in strict liability or negligence and rejecting distinctions based on the manner of injury to the product).

**6.** *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394, 396–98 (5th Cir.) (en banc), *cert. denied* — U.S. —, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). *See generally* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4507 at 88–109 (1982).

**7.** C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2729 (1983) (jury should make the reasonable man determination); *see Croley v. Matson Navigation Co.,* 434 F.2d 73, 75 (5th Cir.1970), *pet. for reh'g denied,* 439 F.2d 788 (5th Cir.1971).

**8.** *See Ketchum v. Gulf Oil Corp.,* 798 F.2d 159, 160–61 (5th Cir.1986) (dismissing plaintiff's tort claim as a matter of law because law did not permit tort recovery against defendant in issue).

Arkwright's counsel also urged that we find that the difference between negligent misrepresentation and negligent design or manufacture justified recovery in this case even if the *Jim Walter Homes* decision would bar recovery for economic loss from negligent design or manufacture. To make this distinction would, however, require that we act as pioneers. This we will not do. "Federal courts in diversity cases do not adopt innovative theories of recovery or defense but simply apply state law as it exists." *Dean v. Dean,* 837 F.2d 1267 (5th Cir.1988), *denying petition for reh'g in* 821 F.2d 279 (5th Cir.1987).

**9.** The performance warranty provided that the Turbine would meet certain specifications during the Performance Test. The Performance Test occurred on June 30, 1980 and the Turbine met the Contract's performance specifications during the Test.

bine to El Paso on July 13, 1979. Twenty-one months after the date of shipment was April 13, 1981. As a result, under the contract, the equipment warranty actually expired on April 13, 1981, twenty-one months after the date of shipment. Thus the equipment warranty expired more than six months before the October 19, 1981 fourth row blade failure.

■ Arkwright argues that the twelve or twenty-one month time limitation on the equipment warranty constituted a remedy limitation.[10] Arkwright argues that this temporal remedy limitation caused the Contract's limited remedy to "fail of its essential purpose" under Tex.Bus. & Com.Code Ann. § 2.719(b) (Vernon 1968), and that this court should therefore strike the time limitation on the remedy. Although § 2.719(a) gives broad permission to limit remedies, § 2.719(b) provides:

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

The official comment explains that

> [W]here an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.[11]

Courts have frequently employed § 2.719(b) to strike "repair or replacement" remedy limitations when a seller is unable or unwilling to repair or replace.[12]

In *Wisconsin Power & Light Co. v. Westinghouse Electric Corp.*, 830 F.2d 1405 (7th Cir.1987), the Seventh Circuit rejected the plaintiffs' contention that a negotiated eighteen month time limitation on a contract warranty caused a remedy to fail of its essential purpose under § 2.719. The Seventh Circuit said:

> This is certainly not a case in which an exclusive or limited remedy failed of its essential purpose. To the contrary, the warranty provisions here operated just as intended, allocating the risk of loss between the parties both before and after the warranty expired. The transformer operated satisfactorily long after the warranty period had run. A purchaser cannot claim that a warranty provision has failed of its essential purpose merely because a potential claim does not arise until after the warranty period has expired.
>
> ... We fully agree with the district court that the "plaintiffs cannot seriously contend that the contract failed of its

---

10. The Contract included a specific remedy limitation provision setting forth the remedies available to El Paso if the equipment failed to comply with the equipment warranty during the warranty period:

> Should any warranted equipment fail to comply with the warranty during the warranty period, and if OWNER promptly notifies WESTINGHOUSE in writing, then WESTINGHOUSE will perform such repair, replacement, or modification as required to meet this equipment warranty, provided OWNER reasonably demonstrates that the equipment has been stored, installed, maintained and operated in accordance with WESTINGHOUSE recommendations and standard industry practice.

11. Tex.Bus. & Com.Code Ann. § 2.719, comment 1 (Vernon 1968). Courts have preferred the comment's "substantial value of the bargain" test to the section's "failure of the essential purpose of an exclusive or limited remedy" test. Anderson, *Failure of Essential Purpose and Essential Failure on Purpose: A Look at Section 2-719 of the Uniform Commercial Code*, 31 Sw. L.J. 759, 767 (1977).

12. *Delhomme Industries, Inc. v. Houston Beechcraft, Inc.*, 735 F.2d 177, 183–84 (5th Cir.1984) (applying Kansas law); *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir.1971) (applying Alabama law); *see also Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir.1980); *Lankford v. Rogers Ford Sales*, 478 S.W.2d 248, 251 (Tex.Civ.App.—El Paso 1972, writ ref'd n.r.e.) (concluding remedy had not failed of its essential purpose because seller had made all requested repairs). This application is consistent with the position that § 2.719(b) "is not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties." Anderson, *supra* note 11, at 763–64 (quoting 1 *Report of the New York Law Review Commission for 1955*, at 584); *see Tampa Farm Service, Inc. v. Cargill, Inc.*, 356 So.2d 347, 351 (Fla.Dist. Ct.App.1978) (unexpected post contract change in circumstances required for relief under § 2–719). Comment 1, quoted above, also supports this interpretation.

essential purpose because they were denied a fair quantum of remedy when the remedy provided for in the contract was a product of their own making." [*Wisconsin Power & Light Co. v. Westinghouse Electric Corp.,*] 645 F.Supp. [1129,] 1138 (W.D.Wis.1986).

830 F.2d at 1412–13.

Similarly, in *Hart Engineering Co. v. FMC Corp.,* 593 F.Supp. 1471 (D.R.I.1984), the district court rejected a plaintiff's attempt to use § 2.719 to avoid a one year limitation on the seller's express warranty for sewage treatment equipment. The *Hart Engineering* court said:

> Section 2–719 is concerned with the circumscription or modification of *remedies,* not with language purporting to define the scope of a seller's *liability.* It is, therefore, plainly inapposite to the one year time warranty contained in the purchase agreement.

593 F.Supp. at 1479 (emphasis in original).[13]

Sophisticated parties certainly have the right to negotiate reasonable restrictions on warranties. Indeed the Uniform Commercial Code does not require that a seller give any express warranty at all. In a contract between two sophisticated corporations, a time limitation on an express warranty is simply a matter of allocating risks. The one year limitation on the equipment warranty was consistent with industry practice and the purchaser, El Paso, knew this. The existence of the one year time limitation, and other warranty limitations, simply caused the purchaser, El Paso, to buy insurance from the plaintiff, Arkwright. As a result we cannot accept Arkwright's contention that we should strike the equipment warranty's expiration clause.

*2. Other potential express warranties.* The Proposal said that the Turbine was "reliable," was designed to "eliminat[e] ... resonant conditions at the operating design speed," and would "provide reliable performance over extended time periods."[14] Arkwright argues that this language created an express warranty that the blades

---

**13.** One court, however, in *Wilson Trading Corp. v. Ferguson, Ltd.,* 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968), found that a ten day time limitation on a warranty was a remedy limitation that caused the remedy to fail of its essential purpose under § 2–719(2). In twenty intervening years no other court has followed this decision and commentators have roundly criticized it. For example, Professor Anderson observed:

> It is difficult ... to track the facts in *Wilson Trading* and the decision of the court with the text of 2–719(2). Arguably, no "exclusive or limited remedy" failed "of its essential purpose" under the facts in the case. It strains semantics to talk of a time limitation as an exclusive or limited remedy. It strains logic and common sense to argue that an essential purpose had failed, that subsequent and unforeseen events had intervened. The clause in question was simply a risk allocator, inserted by the seller for the purpose of limiting its liability by allocating to the buyer risks of latent defects not discoverable within ten days or processing. That purpose had not failed by its subsequently operating to deny the buyer's claim. Indeed that denial was the purpose.... Thus, the validity of the clause should have been denied not because of subsequent intervening events under the standards of 2–719(2) but, if at all, because the clause was invalid at its inception either for failure to provide a "minimum adequate remedy" or "fair quantum of remedy" under the

standards of 2–719(1) or under the standards of unconscionability or manifest unreasonableness set by the Code for inherently oppressive terms. Justice Fuld, in his concurring opinion, supported this analysis by maintaining that he would have based the decision entirely upon section 1–204's prohibition of "manifestly unreasonable" time limitations.

Anderson, *supra* note 11, at 765 (footnote omitted); *see also Wilson Trading,* 297 N.Y.S.2d at 114, 244 N.E.2d at 689 (Fuld, C.J., concurring). Arkwright did not argue that the Contract failed to provide a "fair quantum of remedy" under 2.719(a). Although we address all of Arkwright's unconscionability arguments in section IV, we note here that Professors White and Summers, in their treatise on the Uniform Commercial Code said:

> If we were on the bench, we would not be receptive to claims that time warranties are unreasonable or unconscionable. Since the Code does not oblige the seller to make any express warranties, limitations on such warranties should stand in the absence of inconsistency under 2–316(1).

J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 12–3 at 431 n. 19 (2d ed. 1980).

**14.** Arkwright also relies on portions of the following Proposal language for creation of express warranties:

> In the design of blading, a major consideration is the elimination of resonant conditions

would not crack due to resonance. Section 2.313(a)(1) provides that "[a]ny affirmation of fact or promise" which "becomes part of the basis of the bargain" creates an express warranty. The relevant comment provides that all statements of the seller become part of the basis of the bargain "unless good reason is shown to the contrary." Tex.Bus. & Com.Code Ann. § 2.313, comment 8 (Vernon 1968).

■ The Proposal's language, standing alone, might well be construed to create a warranty. Article 5 of the Contract, however, expressly disclaimed any warranties other than those included in that Article.[15] Article 6 of the Contract limited remedies after completion of the Performance Test to those under the equipment warranty.[16] To the extent that we consider the Proposal's language a warranty it conflicts with the Contract's disclaimer. The first page of the Contract provides:

> In the event of any conflict between basic Contract Document and Appendices [including the Proposal, Appendix B], the basic Contract Document shall prevail.

at the operating design speed. To accomplish this the designer adjusts the blade resonant conditions above and below the normal operating frequency range. By so tuning the important modes of vibration out of resonance, blade vibratory stresses may be substantially reduced. And conversely, by operating a tuned blade system at speeds that produce a resonant condition, these vibratory stresses can be substantially increased. This probability of turbine blade resonance coincident with maximum gas excitation is the main concern of off-frequency operation.

The combustion turbines furnished in Econopac power generating plants may be operated for extended periods in the frequency range of 62 to 58.0 Hz. The blade[s'] natural frequencies are controlled and the design margins are such that there is little likelihood of developing excessive vibratory stress in this range.

Below 58.0 Hz and above 62.0 Hz, resonance is probable and vibratory stresses are more likely to initiate blading fatigue cracks.

Crack initiation and propagation require time. The amount of time depends on the proximity to resonance, magnitude and nature of exciting forces, system damping and material fatigue properties. It is virtually impossible to make unqualified predictions of the precise frequencies at which vibration occurs. Blade material and its heat treatment affect internal material damping, while manufacturing tolerances on blade sections and rotor construction can affect the blade-disc structural system frequencies. Excitation forces are not sharply defined and are affected by deposits on blading, damage or wear to seals and plugging of fuel nozzles. These uncertainties suggest that definitive recommendations for off-frequency operating periods would not be realistic and that it is prudent to avoid off-frequency operation.

15. The contract included the following disclaimer:

> THE WARRANTIES SET FORTH ABOVE ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE. The remedies provided above are the exclusive remedies of OWNER for failure of WESTINGHOUSE to meet[ ] its warranty obligations, whether claims of OWNER are based on contract, in tort (including negligence) or otherwise, and upon expiration of the applicable warranty period all obligations of WESTINGHOUSE for breach of warranty will terminate. The guarantee levels specified in Appendix A and Appendix D are the only guarantees offered in this Contract, other areas of the Contract notwithstanding.

Appendix A included the performance levels that the performance warranty guaranteed that the Turbine would reach during the Performance Test. Appendix D included similar performance levels for an additional optional turbine not in issue here.

16. Article 6 of the contract included the following limitation of liability provision:

> A. Neither WESTINGHOUSE nor its suppliers, or Subcontractors of any tier, will be responsible to OWNER in contract, in tort (including negligence) or otherwise for loss of use of equipment or plant, expenses involving costs of capital, loss of profits or revenues, cost of purchased or replacement power including additional expenses incurred in using existing power facilities, claims of any customers of OWNER, or any special, indirect, incidental or consequential loss or damage whatsoever. *After actual or constructive completion of the Performance Test, [the] total obligation of WESTINGHOUSE arising out of the Work performed hereunder, will be limited to remedies under equipment warranty set forth herein* and to liability arising out of patent infringement.
> ....
> B. This Limitation of Liability clause will apply notwithstanding any other provision of this Contract and shall survive termination or expiration of said Contract.

(emphasis added).

**1182**

Tex.Bus. & Com.Code Ann. § 2.316(a) (Vernon 1968) provides that:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2.202) negation or limitation is inoperative to the extent that such construction is unreasonable.

The relevant comment provides that the purpose of § 2.316(a) is "to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty." Tex.Bus. & Com.Code Ann. § 2.316, comment 1 (Vernon 1968). Westinghouse's disclaimer was neither unexpected nor unbargained for. El Paso bargained for the warranty rights included in Article 5 and knew that the Contract limited express warranties to those contained in Article 5. Given the disclaimer in Article 5 and the remedy limi-

tation in Article 6, we simply cannot believe that the Contract's parties intended the Proposal's language to create an express warranty of unlimited duration. Thus we conclude, as did the magistrate, that the Proposal's language was not part of the basis of the bargain and did not create an express warranty.[17]

In addition, the magistrate noted three other potential bars to Arkwright's recovery under the asserted express warranty in the Proposal. First, even if we found that Westinghouse made an express warranty in the Proposal, the Contract's twelve or twenty-one month warranty period limitation would bar Arkwright's recovery. Second, the exclusive remedies provided for breach of warranty[18] do not include the money damages Arkwright seeks. Third, Article 6(A) precludes all remedies other than repair, replacement or modification after the performance test.[19]

### B. Implied Warranty Claims

■ The contract between El Paso and Westinghouse included a disclaimer of the

---

17. *See Balderson–Berger Equipment Co. v. Blount,* 653 S.W.2d 902, 907–08 (Tex.App.—Amarillo 1983, no writ) (express oral precontract warranty was not part of the basis of the bargain because contract document specifically excluded the warranty); *see also U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 509 F.2d 1043, 1046 (6th Cir.1975) (express warranty exclusion not inconsistent with description; express warranty exclusion held effective).

Arkwright relies on *S–C Industries v. American Hydroponics System, Inc.,* 468 F.2d 852, 854–55 (5th Cir.1972). In *S–C Industries* this court found that language in technical specifications created an express warranty even though the contract document attempted to preclude express warranties other than those in the contract documents. The magistrate found *S–C Industries* distinguishable, however, because that contract did not specify which document would control in the case of a conflict.

Arkwright also relies on two intermediate appellate court decisions which refused to give effect to disclaimers. In *Bowen v. Young,* 507 S.W.2d 600 (Tex.Civ.App.—El Paso 1974, no writ), the disclaimers and exclusions of warranties met the statutory requirements but the court said

> If the trier of the facts concludes that the Appellant made express warranties that the mobile home which the Appellee was purchasing would conform to the sample or model home shown to him on the Appellant's lot,

then the "express warranties rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in the purchase agreement are repugnant to the basic dickered terms."

*Id.* at 605. In *Mobile Housing, Inc. v. Stone,* 490 S.W.2d 611 (Tex.Civ.App.—Dallas 1973, no writ), the contract said no descriptions, samples, or models were part of contract and specified that mobile home was sold "as is." *Id.* at 614–15. The court nevertheless found that a sample was part of the basis of the bargain because the purchasers had looked at it many times and had drawn the contract description from it. *Id.* The court held the description in the contract inadequate and therefore found the contract incomplete. *Id.* The court held that "these express warranties rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in the purchase agreement are repugnant to the basic dickered terms." *Id.*

The facts and circumstances of a case make a difference in how courts interpret words which might create a warranty. These two Texas cases are easily distinguishable because they involved consumer goods and the disclaimers were not dickered terms.

18. *See supra* note 10.

19. *See supra* note 16.

implied warranties of merchantability and fitness for a particular purpose. We have reproduced the contract disclaimer in the margin. *See supra* note 15. Arkwright argues that the disclaimer was not conspicuous, as required by Tex.Bus. & Com.Code Ann. § 2.316(b) (Vernon 1968).[20] The disclaimer was located in Section E of the warranty article, Article 5. The heading for Section E was "General." Arkwright argues that the disclaimer was not conspicuous because it was located in Section E, rather than with the equipment warranty in Section A of Article 5. Tex.Bus. & Com. Code Ann. § 1.201(10) (Vernon 1968), defines conspicuous as follows:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals ... is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". Whether a term or clause is "conspicuous" or not is for decision by the court.

The comment adds that "the test is whether attention can reasonably be expected to be called to it." *Id.*, comment 10. The Contract's disclaimer was printed in all capital letters. The disclaimer was included in Article 5, the warranty article of the Contract. It was in a section titled "General." In these circumstances any reasonable person against whom the disclaimer was to operate ought to have noticed it; we cannot fault the magistrate's conclusion that the disclaimer complied with the requirements of §§ 2.316(b). and 1.201(10).[21]

■ Excepting the conspicuousness argument discussed above, Arkwright's brief and its counsel's oral argument appear to admit that the disclaimer included in the Contract met the requirements of § 2.316(b) for disclaimers of the implied warranties of merchantability and fitness for a particular purpose. Arkwright argues, however, that we should impose an additional requirement of "basic equity and fairness." Arkwright argues that Westinghouse's disclaimer was unfair because Westinghouse allegedly knew that this blade failure was possible. Arkwright's only support for this argument is that the language of § 2.316(b) lists only things that one *must* do to disclaim a warranty and that this grammatical structure leaves room for imposition of additional conditions. We are unpersuaded. Texas courts have certainly considered cases involving misrepresentations but they have not found it necessary to alter warranty law as a result.[22] Instead, Texas courts have held that compliance with § 2.316(b) is sufficient as a matter of law to disclaim the implied warranties of merchantability and fitness for a particular purpose.[23]

■ We have concluded that Texas courts would not permit recovery in tort

20. The statute provides:
   Subject to Subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be *conspicuous*, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and *conspicuous*. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."
   *Id.* (emphasis added).

21. We note that other courts have found proof of a commercial buyer's actual awareness of a disclaimer sufficient to satisfy the conspicuousness requirement. *See Fargo Machine & Tool Co. v. Kearney & Trecker Corp.*, 428 F.Supp. 364, 372 (E.D.Mich.1977) (buyer in equal bargaining position with seller; buyer's testimony established that buyer was actually aware of warran-

ty provisions); *O'Neil v. International Harvester Co.*, 40 Colo.App. 369, 575 P.2d 862, 865 (1978).

22. *See Singleton v. LaCoure*, 712 S.W.2d 757 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (plaintiff alleged nondisclosure of prior wreck involving used trailer purchased from defendant, court treated this misrepresentation as irrelevant to propriety of summary judgment based on warranty disclaimer).

23. *See id.; Mostek Corp. v. Chemetron Corp.*, 642 S.W.2d 20, 24 & n. 3 (Tex.App.—Dallas 1982, writ dism'd by agreement) (court found warranty disclaimer meeting requirements of § 2.316(b) effective, valid, and not against the public policy of Texas); *W.R. Weaver Co. v. Burroughs Corp.*, 580 S.W.2d 76, 81 (Tex.Civ. App.—El Paso 1979, writ ref'd n.r.e.) (court found disclaimer meeting requirements of §§ 1.201(10) and 2.316(b) valid and effective).

for Arkwright's economic loss. Arkwright, however, asserts that we should bend contract law to permit recovery because of the presence of what is, in essence, a possible tort—negligent misrepresentation. While we recognize the inherent difficulty and arguable futility in attempting to keep tort law and contract law entirely separate in these cases,[24] we are not inclined to insert an additional, after-the-fact, requirement into the law of contract. The Contract properly disclaimed the implied warranties of merchantability and fitness for a particular purpose.

## IV. UNCONSCIONABILITY

■ Arkwright argues that three contract clauses are unconscionable. First, Arkwright argues that the disclaimer of implied warranties is unconscionable. Second, Arkwright argues that the limitation of remedies in Article 6 is unconscionable. Third, Arkwright argues that the exclusion of express warranties based on the language in the Proposal is unconscionable. All three claims rest on Westinghouse's alleged nondisclosure of the prior failures. The same analysis applies to all three unconscionability claims and leads inexorably to the conclusion that none of these clauses are unconscionable.

Tex.Bus. & Com.Code Ann. § 2.302 (Vernon 1968), permits a court to disregard any unconscionable clause in a contract. The relevant comment provides that:

The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The

principle is one of the prevention of oppression and unfair surprise ... and not of disturbance of allocation of risks because of superior bargaining power.

*Id.*, comment 1.

Section 2.302 provides that unconscionability is a question of law for decision by the court. Arkwright, as plaintiff, bears the burden of proving unconscionability. *Earman Oil Co. v. Burroughs Corp.*, 625 F.2d 1291, 1299 (5th Cir.1980) (interpreting Florida law). Under Texas law, Arkwright must prove *both* substantive and procedural unconscionability to prevail on the unconscionability issue. *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex.Civ.App.—Texarkana 1975, no writ). A court may find substantive unconscionability if the terms of the contract are one-sided or oppressive. *Id.* A court may find procedural unconscionability if the plaintiff presents evidence of the seller's "overreaching or sharp practices" combined with the buyer's "ignorance or inexperience." *Earman Oil*, 625 F.2d at 1300.

At oral argument, *Arkwright's* counsel explained that before the Contract the Westinghouse engineering personnel who knew of the prior blade failures simply did not discuss the failures with the Westinghouse sales personnel who therefore could not have told El Paso, the buyer. Later, when Westinghouse's information regarding the failures was more developed, the Westinghouse engineering personnel disclosed it to El Paso. This conduct simply does not rise to the level of "overreaching or sharp practices." In addition, there is no evidence that the buyer, El Paso, was either ignorant or inexperienced. Instead the summary judgment evidence showed that El Paso was a knowledgeable and

24. Previous decisions of the Texas Supreme Court illustrate this difficulty. In *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977), the court said that tort law was designed to cover physical injury and that sales law was designed to cover "economic relations between suppliers and consumers of goods." *Id.* at 80 (quoting *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965)). In *Indust–Ri–Chem Laboratory, Inc. v. Par–Pak Co.*, 602 S.W.2d 282 (Tex.Civ.App.—Dallas 1980, no writ), the court noted that "[t]ort theories

and contract theories must be kept distinct." *Id.* at 291. In *Garcia v. Texas Instruments, Inc.*, 610 S.W.2d 456 (Tex.1980), however, the Texas Supreme Court noted that it did not "state that the remedies provided by strict liability in tort and the warranty sections of the Code, are, in all respects, mutually exclusive." *Id.* at 461. The *Garcia* court then concluded that "the Code establishes an alternative remedy to strict liability in tort with respect to injuries suffered from a defective product." *Id.* at 462.

experienced turbine buyer, who had access to literature regarding development of cracks in rotating blades and who occasionally contacted other turbine users to ask about their experience with particular equipment. Arkwright has simply failed to carry its burden of proof on the issue of unconscionability.

## V. IMPLIED SERVICES CONTRACT

 Arkwright alleges that after installation Westinghouse provided technical services to El Paso in exchange for money. Arkwright alleges that this created an implied-in-fact contract for services. Arkwright then alleges that the implied-in-fact contract included an implied warranty of sound workmanship that Westinghouse breached by failing to disclose the blade problems. The magistrate found that there were no facts in the record to support Arkwright's allegation of an implied-in-fact contract and that Westinghouse had provided facts disproving Arkwright's claim. Because there were no facts supporting Arkwright's claim and because there were facts disproving Arkwright's claim the magistrate properly concluded that no trial was required. *See Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222–23 (5th Cir.1986). Arkwright's breach of implied warranty claim therefore fails for lack of proof of an implied contract.

## VI. FAILED UNDERTAKING

 Finally, Arkwright alleges that Westinghouse was negligent in violating a post-sale common law duty to warn. Arkwright bases this allegation on *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.) (manufacturer negligent in failing to cause replacement of defective helicopter blades with redesigned blades when manufacturer's authorized service station repurchased helicopter). Arkwright's allegation fails, however, because under Texas law there is no post-sale common law duty to warn unless the manufacturer regains some significant degree of control over the product. *See Syrie v. Knoll Internation-*

*al*, 748 F.2d 304, 311 (5th Cir.1984) (applying Texas law). In this case, Arkwright presented no evidence whatsoever that Westinghouse had any post-sale control at all over the Turbine.

## VII. CONCLUSION

Finding no merit in any of Arkwright's contentions, we AFFIRM.